IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


FREDERICK LIVINGSTON,                    )
                                         )
          Plaintiff,                     )
                                         )
          v.                             )
                                         )
ALLEGHENY COUNTY, ALLEGHENY              )
COUNTY OFFICE OF CHILDREN, FAMILY        )
AND YOUTH ("OCYF"),NICOLE LUBATTI,       )
*OCYF Caseworker*, BETSY CAREOFF,        )
*OCYF Caseworker*, KAREN NEPPACH,        )          Magistrate Judge Lenihan
*OCYF Caseworker*, DEBORAH               )          Civil No. 07-1010
SADLER-KIMES, *OCYF Caseworker*,         )          Doc. No. 48
KELLY HITCHENS, *OCYF Caseworker*,       )
AMANDA ORR, *OCYF Caseworker, in*        )
*their individual and official*          )
*capacities;* KOZLOWSKI, *Allegheny*     )
*County Detective*, SEAN KELLY,          )
*Allegheny County Detective*, JEFF       )
CORCHECK, *Allegheny County*             )
*Detective, in their individual and*     )
*official capacities;* CHARLES           )
MOFFAT, *Superintendent of the*          )
*Allegheny County Police Department*,)
*in his individual and official*         )
*capacity;* FAMILYLINKS, *a*             )
*Pennsylvania nonprofit corporation*;)
ADELLA DIXON, *both individually*        )
*andin her capacity as a employee*       )
*of FAMILYLINKS*                         )

          Defendants


MEMORANDUM AND OPINION

Lenihan, M.J.

          Frederick Livingston ("Livingston") commenced this civil

rights action against Allegheny County, the Allegheny County Office

of Children, Family and Youth ("CYF") and certain of its law

enforcement and child caseworker personnel in their official and

1

individual capacities, FamilyLinks, a non-profit corporation, and Adella Dixon, a FamilyLinks employee.  Livingston contends that the defendants participated in an unwarranted investigation of sex abuse charges against him which resulted in his false arrest, false imprisonment, and malicious prosecution that violated his constitutional right of protection from unreasonable search and seizure guaranteed by the Fourth Amendment and his substantive due process rights under the Fourteenth Amendment.  Alleged concerted nature of the county employees' activity forms the basis for Livingston's conspiracy claim under 42 U.S.C. § 1985.  Livingston's complaint also included state law claims for false arrest, false imprisonment, intentional infliction of emotional distress, malicious prosecution, and negligence.  The defendants have filed a motion for summary judgment claiming that there is no evidence that they violated Livingston's constitutional rights and that, in any event, they are entitled to immunity.

After careful consideration, the defendants' motion for summary judgment (Docket. No. 48) will be granted [1]

---

[1]

At this stage of the litigation, the list of defendants can be pared down as follows: 1) Although Allegheny County is an entity subject to suit, Allegheny County Office of Children, Youth, and Family is a unit of the county without a separate corporate identity and cannot be sued independently.  <u>Breakwell v. Allegheny County</u>, Civ. No. 08-389, 2008 WL 3895698, at *4 (W.D.Pa. August 22, 2008); 2)  On November 20, 2008, the parties entered into a stipulation of dismissal as to all claims pertaining to defendant FamilyLinks (Docket No. 39); and, 3)  In his Brief in Opposition to Summary Judgment, Livingston informs that he does not oppose entry of summary judgment in favor of defendants Deborah Sadler-

I.   <u>Facts</u>

Livingston, a police officer employed by Edgewood Borough, and Carmen Williams ("Williams") are the parents of two daughters, N.W. and B.W.  Livingston and Williams are not married, but lived together off and on for a number of years.

On or about March 6, 2002, B.W., then fourteen years old, informed a school nurse that her father was physically abusing her. The allegations were referred to and investigated by CYF and were determined to be unfounded.  On April 24, 2002, CYF informed Livingston that it had concluded its assessment and the matter would be closed.

On May 6,2002, Livingston filed a dependency petition against B.W., alleging that she was disruptive in school and was failing seventh grade.  He also asserted that his daughter was non-responsive to discipline and required a mental health evaluation.  Livingston eventually withdrew this petition, but on May 28, 2003, filed a second petition averring that B.W. continued to be a discipline problem.  This petition was filed shortly after B.W. was arrested and charged with criminal mischief after she cut up some of Livingston's police uniforms with a razor blade.  This petition was dismissed and the case was closed on September 10, 2003.

Livingston filed a third dependency petition regarding

_____

Kimes, Kelly Hitchens, Adella Dixon, or Amanda Orr because of their minimal participation in the complained-of events.  Pl's Br. 2, n.1.

B.W. describing further disruptive behavior and poor academic achievement.  Around this time, Nicole Lubatti ("Lubatti"), a CYF caseworker, was assigned to the case.  After a hearing, on July 28, 2004, B.W. was adjudicated delinquent in the Court of Common Pleas of Allegheny County.  The court ordered that B.W. remain with her mother and have no contact with Livingston, who had moved out of the house.  The parents were referred to counseling.

Problems with B.W. continued, however, and she ran away from home in August 2004.  CYF requested a shelter hearing to determine an appropriate placement for B.W. and, after a hearing on August 20, 2004, she was placed in a shelter and was ordered to undergo a drug and alcohol and mental health evaluation.  B.W.'s parents were allowed visitation rights subject to a recommendation by a family therapist.  On September 22, 2004, B.W. was released from the shelter to live with her mother and she was ordered to continue family therapy with both her mother and father.

On November 15, 2004, B.W was again placed in a shelter. Supervised parent visits were permitted only if B.W. consented. B.W.'s therapy was to continue and CYF was directed to schedule family therapy.  On January 25, 2005, B.W. was granted permission to live with her maternal grandmother.  Additionally, Lubatti and her supervisor, Betsy Careoff ("Careoff") referred the family to the Family Group Decision Making, a CYF unit designed to assist families in addressing their domestic conflicts.

Adella Dixon ("Dixon") was the Family Advocate assigned to assist the Livingston/Williams family to work towards

4

reunification of B.W. with either of her parents.  Dixon separately explained to B.W., Livingston, and Williams that all parties must be willing to participate in the program and all three agreed to cooperate.  On March 28, 2005, the family developed a plan, in part, to facilitate visitation by Livingston that included an agreement that the family would be evaluated by a psychologist. B.W. insisted that she be permitted to visit the psychologist on her own and her parents agreed to this modification.

On March 30, 2005, Dr. Pat Piercy conducted a counseling session with B.W.  During this session, B.W. disclosed that Livingston had sexually abused her older sister, N.W., then seventeen years old.  When the abuse allegations were reported to CYF, Careoff called in a Child Line Report to the Child Protective Services unit of CYF, where the investigation was referred to Karen Neppach ("Neppach"), an intake caseworker.  Careoff also dispatched two Family Service caseworkers, Kelly Hitchens and Amanda Orr Dunmeyer, to N.W.'s school to interview her.  When N.W. confirmed that she had been sexually abused by Livingston, CYF became responsible for N.W.'s safety and an emergency custody authorization was procured entrusting B.W. to her maternal grandmother's care.

In accordance with the Pennsylvania Child Protective Services Law, 23 Pa. C.S. §6301 et seq., CYF initiated an investigation of the allegations against Livingston.  Additionally, the matter was referred to the Allegheny County Police where Detectives Sean Kelly ("Kelly") and Dennis Kozlowski ("Kozlowski")

conducted a parallel, but separate investigation.

On April 13, 2005, Dr. Susan Nathan, a licensed psychologist, conducted a forensic interview with N.W. at the Mercy Children's Medical Center. Detective Kelly, Neppach and Hitchens observed the interview. At its conclusion, N.W. was administered the Trauma Symptom Checklist for Children and Adolescents where:"[N.W.] scored in the clearly significant range on 9 of 10 scales, indicating anxiety, depression, anger, post-traumatic stress, disassociation, and sexual concerns." Pl's App. Exhibit FF, Dr. Susan Nathan's Forensic Report 4. Dr. Nathan concluded that there was "a probable likelihood that N.W. was a victim of chronic sex abuse by her father." Id.

Dr. Nathan discussed her findings with Neppach who then interviewed Livingston. Neppach also made several unsuccessful attempts to contact Williams. When Neppach concluded her investigation, she discussed her findings with her supervisor and it was determined that a report of abuse was indicated.

In their investigation, Detectives Kelly and Kozlowski, accompanied by Deputy District Attorney Laura Ditka, the head of the District Attorney's Office Child Abuse Unit, conducted an interview with N.W. to clarify portions of N.W.'s disclosure not fully explored during the forensic interview. Kelly and Kozlowski also questioned Livingston, Williams, and B.W. B.W told the detectives that, approximately five years earlier, N.W. told Williams that Livingston molested her. Williams confirmed that N.W. made this disclosure, but stated that N.W. described the ordeal as

a dream.  Livingston for his part denied the allegations and characterized N.W. as promiscuous.  Livingston produced a bill from Children's Hospital contending it was related to N.W.'s attempt to procure an abortion.  A check of the date of the invoice revealed that it coincided with a suicide attempt by N.W.  The detectives also attempted to interview R. B., a friend of N.W.'s, and a possible witness, but were unable to schedule an interview with her.

The detectives discussed the results of their investigation with Ms. Ditka to determine if there were sufficient grounds to file a criminal complaint.  Ms. Ditka recommended that charges be filed and Livingston was arrested and charged with criminal offenses connected to his alleged abuse of N.W.  After a jury trial, Livingston was acquitted of the charges and the indicated report of child abuse was expunged.

On July 7, 2007, Livingston filed the instant lawsuit asserting a variety of claims premised on federal and state law against numerous defendants.  Count one alleges that the detective defendants violated his constitutional rights by falsely arresting, imprisoning, and prosecuting him without probable cause for the arrest.  Livingston also asserts in this count that all defendants, individually, officially, and in concert with one another violated his substantive due rights under 42 U.S.C. §§ 1983 and 1985 by conducting a constitutionally deficient investigation of the sex abuse charges which they knew were fabricated.  Livingston contends that the reason for the cursory investigation was traceable to an

Allegheny County policy, practice, or custom of failing to adequately train its caseworkers and detectives in investigating allegations of sexual abuse. Counts two through six outline Livingston's state law claims of false arrest, false imprisonment, intentional infliction of emotional distress, malicious prosecution, and negligence.

All defendants filed a motion for summary judgment arguing that Livingston failed, as a matter of law, to establish that any of his constitutional rights were violated. The defendants additionally assert that the claims raised against them in their individual capacities are barred by absolute or qualified immunity and that the state law claims are barred by the Political Subdivision Tort Claims Act, 42 Pa. C.S. § 8541. Defendant Allegheny County urges dismissal of the claims against it, citing the lack of evidence to support a failure to train theory and Superintendent Moffatt disputes the availability of respondeat superior liability in section 1983 actions.

## II.   Legal Standard

Under Fed.R.Civ.P.56(c), "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law[,]" summary judgment should be granted. The threshold inquiry is whether there are any genuine factual issues that can be properly resolved only

by a finder of fact because they may reasonably be resolved in favor of either party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250(1986). A court may grant summary judgment if the non-moving party fails to make a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322(1986). In making this determination, the non-moving party is entitled to all reasonable inferences. <u>Lawrence v. City of Philadelphia</u>, 527 F.3d 299, 310 (3d Cir. 2008). A court may not, however, make credibility determinations or weigh the evidence in making its determination. <u>Reeves v. Sanderson Plumbing Products Inc.</u>, 530 U.S. 133, 150(2000).

    III. <u>Discussion</u>

Under Section 1983, a person " who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996). Section 1983 does not itself create rights, rather it is remedial in nature. <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979).

To succeed on a section 1983 claim, a plaintiff must

9

demonstrate that the defendants, acting under color of law, violated federal constitutional or statutory rights, and caused injury.  Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005). Government officials performing discretionary functions are generally shielded from liability for civil damages as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

 A.   CYF Caseworker Liability - Substantive Due Process[2]

 Social workers are entitled to absolute immunity for their activities in "petitioning for, initiating and prosecuting dependency cases.  Ernst v. Child and Youth Services of Chester County, 108 F.3d 486, 493 (3d Cir.1997).  However, absolute immunity does not apply to "investigative or administrative actions taken ... outside the context of a judicial proceeding," id. at 497 n. 7, and caseworkers may be liable for conduct "during the investigative phase of a child custody proceeding." Miller v. City

---

[2]

 In the argument portion of his brief, Livingston describes only those actions taken by CYF intake caseworker Karen Neppach as constitutionally deficient. Although the brief references quotations from depositions of defendant Lubatti and Dixon, no longer a defendant, as evidence that CYF caseworkers were aware of his dissatisfaction with the agency as a whole and that some workers considered him to be unreasonably demanding, he does not identify these caseworkers by name nor detail how the workers' perceptions of him violated his constitutional rights.  Thus, discussion of this issue is limited to the conduct of Neppach's investigation.

of Philadelphia, 174 F.3d 368, 376 n. 6 (3d Cir.1999). Therefore, we must consider if the CYF caseworkers are protected under qualified immunity.

Determining whether qualified immunity applies is a two-step process: "First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right." Williams v. Bitner, 455 F.3d 186, 190 (3d Cir.2006); See also Miller, 174 F.3d at 374 (when defendant raises immunity as defense to constitutional rights violation, correct approach is to first ascertain validity of alleged violation). If the court finds that a defendant violated a constitutional or statutory right, then "the court must determine whether the constitutional or statutory right allegedly violated by the defendant was 'clearly established.' " (citation omitted). If no constitutional right has been violated were the allegations established, the inquiry concerning qualified immunity ends. Wright v. City of Philadelphia, 409 F.3d 595, 600 (3d Cir. 2005).

Under these guidelines, the court turns to Livingston's allegation that Neppach violated his constitutionally-protected substantive due process rights. Substantive due process is a component of the Fourteenth Amendment that protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them." Collins v. City of Harker Heights, Texas, 503 U.S. 115, 125(1992). Additionally, the due process clause prohibits government

interference with familial relationships unless the government
follows the dictates of procedural and substantive due process.
Croft v. Westmoreland County Children and Youth Services, 103 F.3d
1123, 1125 (3d Cir. 1997). In other words, "the touchstone of due
process is the protection of the individual against arbitrary
action of government." Wolff v. Mc Donnell, 418 U.S. 539, 558
(1974). When abusive action by a government employee is alleged,
"only the most egregious official conduct can be said to be
arbitrary in the constitutional sense," see County of Sacramento v.
Lewis, 523 U.S. 833, 846 (1998), and the official will be exposed
to liability only if their action was "so ill-conceived or
malicious that it shocks the conscience." Id.

        The amount of wrongfulness that constitutes conscience-
shocking behavior can vary by context, therefore, it is critical to
examine the particulars of each case to determine the potential
culpability. It is initially noted that officials can not be held
liable for actions that are merely negligent as negligence is
"categorically below the threshold" necessary to qualify as
conscience-shocking. Lewis, 523 U.S. at 849. The Court of Appeals
for the Third Circuit, following Lewis, delineated a culpability
spectrum to evaluate state actors' conduct. On one end, are those
instances where the exercise of unhurried judgment by state actors
is impossible, such as high speed police chases or prison riots.
In those situations, only an "intent to harm" the plaintiff would
be considered conscience-shocking. Miller, 174 F.3d at 375.
However, where there is time and opportunity to proceed in a

calculated fashion, conduct which is deliberately indifferent could shock the conscience.  <u>Sanford v. Stiles</u>, 456 F.3d 298, 306 (3d Cir. 2006); <u>See also</u> <u>Nicini v. Morra</u>, 212 F.3d 798, 811 (3d Cir. 2000)(social worker with time to make unhurried judgment in investigating whether to permit child to remain with para-foster parent should be judged under deliberate indifference standard). Here, it appears that Neppach was able to conduct her investigation in a non-emergency context, therefore, her actions will be evaluated under the deliberate indifference standard.  This standard requires evidence that Neppach was deliberately indifferent to a substantial risk of harm to Livingston and did nothing to prevent it.  <u>A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center</u>, 372 F.3d 572, 587 (3d Cir. 2004).

Livingston argues that a genuine issue of fact remains as to whether Neppach's investigation of the sexual abuse charges was so cursory that it amounted to a deprivation of substantive due process.  He claims that the investigation was unwarranted and motivated by CYF's desire to seek retribution against him because he was a difficult and domineering personality, dissatisfied with the agency's performance concerning his efforts to exert control over his daughters.  Central to Livingston's argument is his contention that Neppach failed to follow established Allegheny County protocol in conducting the investigation.  Livingston points to Neppach's testimony that CYF does not have a manual outlining procedures to be followed in these instances, but claims that such a policy  indeed  exists and should have been followed in

13

investigating the charges against him.

In his Request for Production of Documents, Livingston asked the defendants to produce copies of any policies or procedures that CYF or the Allegheny County Police refer to or follow or are supposed to refer to or follow when conducting investigations into child abuse allegations. In response, defendants produced a document entitled " ALLEGHENY COUNTY PROTOCOL FOR INVESTIGATION AND PROSECUTION OF CHILD ABUSES CASES." The protocol provides that CYF and the police should act as a multi-disciplinary team and outlines actions to be taken by investigators of child abuse cases. The protocol further directs that the child be subject to a forensic interview, that physical evidence be gathered, that school and medical records be obtained, and that possible witnesses be interviewed. Livingston claims that if the protocol was followed, exculpatory evidence would have been uncovered exonerating him and relieving him from the burden of having to stand trial. Specifically, Livingston avers that if the investigators had reviewed the CYF case file pertinent to his family, they would have uncovered that fact that B.W. had made similar allegations against Livingston and that these accusations were determined to be unfounded. Livingston also claims that review of the family's history with CYF would reveal that B.W. leveled abuse allegations against him so that Livingston would relax the restrictions he imposed on B.W.'s behavior.

Livingston also faults Neppach because she did not interview R.B., a friend of N.W.'s. In her forensic interview,

N.W. stated that she disclosed her father's sexual abuse to R.B., but Neppach did not question R.B. to corroborate the statement.

Regarding the failure to obtain school and medical records, Livingston urges that review of B.W.'s school records would have confirmed her reputation for untruthfulness. Additionally, the medical records would demonstrate that several months before the abuse allegations came to light, N.W. attempted suicide.  The report from the hospital emergency room informed that "[N.W.] stated she was very upset with her parents.  Parents do not let her do what she wants to do and never listens to her."  Pl's App. In Resp. to Mot. Summ., Exhibit X.  This information, according to Livingston, was probative of N.W.'s frustration with her father's strict oversight of her personal life and would demonstrate that N.W. was motivated to lie about her father.  Finally, Livingston blames Neppach for her failure to interview either B.W. or Williams in contravention of the protocol's direction that relevant witnesses could include siblings or the non-offending parent.

Neppach admitted in her deposition that she was aware of a protocol in Allegheny County regarding the investigation of child abuse claims.  When she was shown a copy of the protocol produced in discovery and asked if she had ever seen it, she responded, "I probably have."  Neppach Dep. 60, Jan. 13, 2009. In follow up questioning, Neppach responded to a number of questions regarding the specifics of the protocol until defense counsel objected to a specific query as to whether the Allegheny County protocol applied

to CYF.  When Neppach was again shown the document and asked if it was the protocol she was to follow, she backpedaled and stated: " This is not - what I can say is the protocol is that we get a report, we contact the reporting source,; if it's a sexual abuse allegation, we will interview the child, . . . , we will schedule a forensic interview, we will interview the alleged perpetrator and the non-offending parent" and that she conducts an investigation based upon her training.  Id. at 65.  Neppach confirmed that her investigation constituted of attending the N.W.'s forensic interview and interviewing Livingston.  She admitted that she did not interview N.W.'s pediatrician, her teachers, her friend R.B. or N.W.'s sibling, B.W.  She claims that she made several attempts to contact Williams, but that Ms. Williams never responded to her calls or messages.

Viewing this information favorably to Livingston, it appears that Neppach had some knowledge of the existence of the protocol and that her investigation was not in conformity with the dictates of the policy.[3]  However, Neppach did not conduct her investigation with deliberate indifference and it was not deficient

---

[3]

It is noted that the defendants offered no assistance to the court to determine the applicability and or the force and effect of the published Allegheny County protocol.  Their response to Livingston's claims regarding the protocol consist of  bald assertions that the protocol did "not apply to this particular allegation of abuse", but offer no rationale for this conclusion.  See Defs.' Resp. Stat. To Pl.'s Counter-Stat. of Facts ¶¶ 149 -159.

to the extent that it would shock the conscience.  First, when
Neppach was assigned the case, she had a general conversation with
N.W., but did not discuss the sexual abuse allegations with her.
Neppach explained that out of concern for the possible trauma
associated with multiple interviews about the alleged abuse,
questions as to the specifics of the allegations against Livingston
were reserved for N.W.'s single forensic interview with Dr. Nathan,
which was observed by Neppach and the Allegheny County detectives.
Neppach then interviewed Livingston and made a number of attempts
to talk to Carmen Williams, albeit unsuccessful.  In regard to
other aspects of her investigation, Neppach stated that she did not
obtain school records because she did not feel they would be
relevant to a sexual abuse charge.  She also stated that, in
instances where she believes the child has made a credible
disclosure,  she does not typically interview teachers or friends
for reasons of confidentiality.  Regarding contact with B.W.,
Neppach stated that although it was customary for her to interview
the reporting source, she did not recall whether she did so in this
matter.  As to the medical records, Neppach did not consult all of
N.W.'s records, but did review a report from Western Psychiatric
Hospital that disclosed that N.W.'s parents did not want their
daughter to speak to a psychiatrist.  Finally, Neppach admitted
that she did not review the CYF case file regarding the
Livingston/Williams family, but she was aware that at least one
dependency petition had been filed against B.W.

        While a comprehensive probing of the allegations at issue

17

would have included a review of N.W.'s complete medical records and the CYF case file pertinent to this family, a discussion with B.W., the reporting source, and a more aggressive attempt to interview Williams, there is not a scintilla of evidence that Neppach's less than textbook investigation was conducted with deliberate indifference to a substantial risk of harm to Livingston.  Neppach may arguably have been negligent in conducting an incomplete investigation, but, the high standard of deliberate indifference cannot be inferred from negligence alone.  Thus, Livingston has failed to prove a case for subjecting Neppach to substantive due process liability.  Because no constitutional deprivation of rights occurred, the question of immunity need not be addressed.

      B.  <u>Detectives Kelly and Kozlowski Liability</u>

          1.  Substantive Due Process

Livingston similarly alleges that his substantive due process rights were violated by the superficial investigation of the sexual abuse charges by Allegheny County Detectives Kelly and Kozlowski.

The detectives were assigned to the Livingston case based upon a report of suspected sexual abuse filed by CYF.  The detectives testified that they decide how to conduct the investigation, but that it usually begins with the forensic interview.  After they observed the interview, the detectives questioned Livingston, B.W., and  Williams and observed a second interview of N.W. conducted by Deputy District Attorney Ditka.

They also attempted a number of times to contact R.B., N.W.'s friend, but she did not cooperate with them.

Livingston's complaints concerning the detectives investigation mostly mimic those leveled against Neppach, *e.g.*, failure to examine the family's prior history with CYF which would have uncovered B'W.'s prior unfounded accusations of physical abuse against Livingston, B.W.'s reputation for untruthfulness, failure to interview teachers and treating physicians and review school and medical records, and failure to interview R.B.   Again, Livingston complains that the police did not follow the Allegheny County protocol in conducting their investigation.

It is observed at the outset that, as opposed to Neppach's admission to some familiarity with the details of the protocol, neither Kelly nor Kozlowski had any knowledge of its contents.  Kozlowski stated that he was aware that a protocol existed, but that he had never read it; Kelly was not asked any questions concerning the protocol.

In any event, Detectives Kozlowski and Kelly testified consistently regarding their investigation of the alleged abuse charges.  They believed N.W. to be credible based upon her demeanor during the forensic interview.  Detective Kozlowski also recalled that Dr. Nathan opined after the forensic interview that there was a strong likelihood that the offenses alleged by N.W. had occurred. Regarding their interview with B.W., the detectives acknowledged that they were aware of B.W.'s tumultuous relationship with

19

Livingston, but explained that she was questioned only as a reporting source and that it was their impression of N.W.'s credibility, not B.W.'s, that informed their investigation. The detectives were also of the same mind that, although Williams did not believe N.W.s's initial disclosure that Livingston was abusing her, Williams changed her mind by the time of her interview with them. Regarding contact with teachers and acquisition of school records, Detective Kozlowski did not feel such steps were necessary to the investigation because N.W. had not disclosed the abuse to her teachers. Detective Kelly for his part explained that he did not request production of the medical records based on his understanding that this was the responsibility of the district attorney's office. As for N.W.'s second interview with the deputy district attorney, the detectives stated that, out of courtesy for Livingston's status as a fellow police officer, and because the alleged abuse occurred a number of years ago, the second interview of N.W. was conducted to clarify some of the information related in the forensic interview. Finally, both detectives testified that several attempts were made to contact R.B., but that those attempts were unsuccessful.

Even viewing this evidence favorably to Livingston, the detectives' investigation was quite thorough and does not come close to approaching the requirement that they conducted their investigation with deliberate indifference to Livingston's rights. Indeed, there is not even a hint of negligence. Thus, Livingston cannot show a genuine issue of fact that the detectives violated

his substantive due process rights.

    2.  <u>False Arrest</u>

    To prevail on his section 1983 false arrest claim at trial, Livingston would have to demonstrate that the detectives lacked probable cause to arrest him.  <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 634 -35 (3d Cir.1995); <u>see also</u> <u>Dowling v. City of Philadelphia</u>, 855 F.2d 136, 141 (3d Cir.1988)(proper inquiry in section 1983 false arrest claim is not whether the person committed offense, but whether arresting officer had probable cause to believe person arrested committed offense).

    In essence, Livingston's basis for claiming that the detectives did not have probable cause to arrest him is a rehash of his argument that their investigation of the criminal charges was deficient:  B.W., the reporting witness was inherently unreliable, the decision to re-interview N.W. indicates that the detectives doubted her credibility, and the detectives' failure to interview R.B. and to obtain N.W.'s medical and school records.

    As already discussed, the detectives related that N.W.'s credible disclosure that Livingston sexually abused her primarily reasoned their decision that probable cause existed for Livingston's arrest.  As to the remaining reasons offered by Livingston that the arrest was without probable cause, the detectives explained that B.W. was questioned only as a reporting witness whose credibility was not a crucial factor, the school records were irrelevant, the acquisition of the medical records was

not within the purview of their authority, and a number of attempts were made to contact R.B.

Probable cause existed for Livingston's arrest on sex abuse charges. There was a disclosure by the alleged victim which was deemed credible by Dr. Nathan and the police detectives after the forensic interview. Williams confirmed that N.W. had disclosed the abuse, and the detectives did not find Livingston believable when they interviewed him. Additionally, rather than being faulted for re-interviewing N.W., it argues in favor of the detectives' diligence that they sought clarification of N.W.'s allegations before they reached their probable cause conclusion.

As probable cause existed for the arrest, Livingston cannot pursue a Fourth Amendment claim for false arrest.

3.  <u>False Imprisonment</u>

Livingston's complaint also stated a claim for false imprisonment for the period he was incarcerated prior to posting bond and for the restrictions imposed after he was released and the case was pending. Livingston averred that his constitutional right to liberty was violated during this time period because the detectives knew that he did not sexually abuse his daughter, or, as restated, the detective did not have probable cause to have him arrested on sexual abuse charges.

A section 1983 claim for false imprisonment is based upon the Fourteenth Amendment protection against deprivations of liberty without due process of law. <u>Baker v. McCollan</u>, 443 U.S.

137, 142 (1979).  The <u>Baker</u> Court instructed that an arrest based
on probable cause cannot provide the rationale for a claim for
false imprisonment.  Id. at 143;  <u>Groman</u>, 47 F.3d at 636 (<u>Baker</u>
instructs that arrest supported by probable cause cannot be source
for § 1983 false imprisonment claim).  As Livingston's arrest was
based upon probable cause, he does not have a viable § 1983 false
imprisonment claim.


    4.  <u>Malicious Prosecution</u>

Livingston also claims that he was maliciously prosecuted
because the investigating detectives knew the child abuse charges
against him were unfounded, yet they continued to pursue them.  He
also contends that police defendants, Charles Moffat and Jeff
Korczyk, intimidated his Edgewood Police Department partner,
Officer Leslie Lewis, from testifying on his behalf at his trial.
According to Livingston, during an interview, Moffat informed Lewis
that she had been "red-flagged" for attending Livingston's
preliminary hearing and that Korczyk advised her not to testify on
Livingston's behalf.  Livingston argues that from these facts
reasonable minds could conclude that the police had doubts about
the merits of the case against him and tampered with a defense
witness to preclude presentation of testimony favorable to him.

To succeed on a claim of prove malicious prosecution under
section 1983, Livingston must establish:

    (1) the defendants initiated a criminal

23

> proceeding; (2) the criminal proceeding ended
> in plaintiff's favor; (3) the proceeding was
> initiated without probable cause; (4) the
> defendants acted maliciously or for a purpose
> other than bringing the plaintiff to justice;
> and (5) the plaintiff suffered deprivation of
> liberty consistent with the concept of seizure
> as a consequence of a legal proceeding.

Estate of Smith v. Marasco , 318 F.3d 497, 521 (3d Cir. 2003).
Livingston's claim for malicious prosecution is again based upon his
allegation that the warrant for his arrest issued without probable
cause and that, knowing this, the police then proceeded to thwart
his defense by intimidating a favorable character witness.

Without comment on whether Livingston can establish an
underlying constitutional violation for a malicious prosecution
claim grounded on a theory of witness intimidation, see Merkle v.
Upper Dublin School District, 211 F.3d 782, 792 (3d Cir. 2000), it
has already been determined that, based on the information available
to officers at the time the warrant was sought, there was probable
cause for arrest.  Because initiation of the proceeding without
probable cause is an essential element of a malicious prosecution
claim, summary judgment in favor of the defendants is likewise
appropriate on this claim.

Finally, as with Neppach, because no constitutional
deprivation of rights occurred, the question of the police officers'
immunity need not be addressed.

C.   Police Superintendent Charles Moffat Liability

The sole substantive violation against Superintendent

24

Moffat concerns his participation in the alleged intimidation of Officer Lewis which was intertwined with Livingston's malicious prosecution claim.  As no constitutional violation occurred, Superintendent Moffat cannot be held liable for his involvement.

In the event that Livingston is alleging liability against Moffat on a theory of respondeat superior, this claim likewise fails.  Liability in civil rights case against supervising officer under § 1983 cannot be based on respondeat superior.  <u>Brown v. Rinehart</u>, 325 F. App'x. 47, 50 (3d Cir. 2009).

### D.  <u>Conspiracy</u>

In his complaint, Livingston also alleged that the Allegheny County detectives and C.F. caseworkers violated 42 U.S.C. § 1985(3)by acting in concert to investigate and prosecute the sexual abuse charges when they knew that the allegations were false. Livingston claims that the county employees persisted in the investigation because of his race, African-American, and because he continued to challenge the competency and decision-making ability of the defendants.

To establish a section 1985 violation, Livingston must demonstrate: 1) the existence of a conspiracy; 2) motivated by racial discriminatory animus designed to deprive him of equal protection of the law; 3) an act in furtherance of the conspiracy; and, 4) an injury or deprivation of a constitutional right.  <u>Lake</u>

v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997).

Livingston appears to have abandoned his claim of conspiracy as his brief makes no mention of a section 1985 violation nor does it describe any concerted illegal activity among the defendants.   Indeed, as part of his argument concerning the shoddiness of the investigation, Livingston references the fact that there was no sharing of information between the caseworkers and the police:  "Other than attending the forensic interview together, C.F. and the police[] investigations did not cooperate, share information, or overlap."  Pl.'s Resp. Concise Statement of Material Facts ¶ 105.(Docket No. 53).

Regardless, the section 1985 claim fails because Livingston was not denied a constitutional right nor is there any evidence that a conspiracy existed.

E.   Municipal Liability

Livingston also alleges that Allegheny County can be held liable under section 1983 because it failed to adequately train its caseworkers and detectives in investigating allegations of sexual abuse and/or had an unconstitutional child abuse investigation policy that was a causative factor in the violation of his constitutional rights.

Municipalities may be held liable in section 1983 cases only in limited circumstances.   Monell v. Department of Social

26

<u>Services of New York</u>, 436 U.S. 658, 688-89 (1978). If a section 1983 lawsuit is brought against a municipality, liability can only attach if the purported constitutional violation implements a policy officially adopted by the governing body or an informally adopted custom. <u>McTernan v. City of York, PA</u>, 564 F.3d 636, 657 (3d Cir. 2009). Livingston cannot show the underlying constitutional violation critical to success on a possible claim against the municipality for failure to train.

      F.  <u>State Law Claims</u>

      Under 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed the claims over which it has original jurisdiction.  The Court of Appeals for the Third Circuit has read this provision, as interpreted by <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 725 (1966), to instruct that  "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." <u>Borough of West Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995).

      Because the Court will grant defendants' summary judgment motion as to the federal claims, it declines to exercise supplemental jurisdiction over Livingston's state law actions brought against the defendants, and those claims will be dismissed

27

without prejudice.  For this reason, there is no need for this tribunal to address the question of state law statutory immunity.

     G.  <u>Conclusion</u>

     For the reasons stated, the Defendants' motion for summary judgment will be granted.  An appropriate order will be entered.


Dated; January 27, 2010

                                Lisa Pupo Lenihan
                                U.S. Magistrate Judge

'